Thank you, Your Honor. Our fifth case for this morning is Bruno v. Commissioner Saul. And we should have Jason Rudman and Leo Montenegro with us, which it appears that we do. So Mr. Rudman. Thank you, Your Honors. May it please the Court. My name is Jason Scott Rudman, and I am the attorney for the appellant, John Bruno, also known as John B. Forgive my background, that's how we did the test, and it was okay. And forgive my mask. I do have a colleague in the room now. This is a step five case, meaning the commissioner has the burden of showing that John B., in light of his age, education, job experience, and functional work capacity, is capable of performing other work, and that such work exists in the national economy. Okay. So there's three main issues. First has to do with lack of substantial evidence of concentration, persistence, and pace limitations. Second has to do with lack of substantial evidence for how the activities of daily living excuse me. Activities of daily living, yes, we understand. Video games. Function to, you know, actually impact on work. And finally, as to substantial evidence related to step five jobs. So first off, as to the concentration, persistence, and pace, or pace, however you want to phrase it, limitations, first has to do with the problems communicating that he has. There's evidence that, in the school records in particular, that he's having to be asked yes no questions and summarized back. There's issues, the school records suggest every 10 minutes, he's having to be checked in and monitored or coached. The dad and the cousin work with him on the night shift, and between the two of them, they're checking in with him four to six times and having lunch with him. There's also evidence that he simply shuts down and doesn't persist or maintain pace without intervention. And he's also got sleepiness issues, probably from a variety of reasons from the medication side effects. In fact, the school records say he needs to rest as needed when those side effects affect him, but also there's the issue of his morbid obesity. And so these things lead to RFC limitations that are not accounted for in the RFC. And so from requiring help and redirection to task, to being off task too much, to progressive discipline problems, you know, in terms of failing to respond appropriately to whether it's the coworkers or the work environment or otherwise, as well as obviously ability to rest as needed. Now going to the second issue in terms of the overemphasis of daily activities. This is a situation where the big picture is about this part-time job he's doing. First off, his family took considerable efforts to get him that job. His family has, it takes ongoing considerable effort to help him keep that job in terms of the check-ins and spending time with him, apparently coaching at home. The family has, and this is kind of reading between the lines, but it appears that the family has played a significant role in allowing him to not lose the job. So could I just ask Mr. Rodman, this is sort of a broad question. I don't doubt that there is evidence in this record that would have supported a finding of disability, but that's not really the question before us. The question before us is whether there is a way supported by the record to support the administrative law judge's weighing of these things. And the RFC does contemplate relatively simple work, work that can be supervised if need be, and it's really very modest jobs that the vocational expert focuses on. And I thought the vocational expert actually in this instance did a pretty good job of explaining how he came up with the numbers that he came up with. So there is evidence that would support this RFC. Is there not? And if there is, you know, I mean, like I was thinking of the video games. I'm probably showing my age or something, but I can remember, you know, some people who play video games are just enwrapped by them, and they focus, you know, the world could be burning down around them, they don't even know. And other people are just sort of fiddling around, and you die, and you start your round again, and you start your level again, and they're really not paying that much attention to it. So the ALJ is drawing an inference that if he can sit there for four hours and play video games, maybe he can concentrate. His father did have something to do with his having this job at the bakery, but he does clearly have a supervisor. His father is sometimes talking to that supervisor. Why is this just one of these marginal cases that we have to go with the ALJ? Okay. So first of all, I don't see this as a marginal case. Most of what you said, I agree with in the notion that in terms of what the burden is, but what he's got is a modest part-time job with accommodations, and I think that for policy reasons, that needs to be accounted for. In terms of the substantial evidence question, in terms of like the concrete evidence, and this is something that's helpful to talk about in oral argument because it doesn't necessarily come up in briefing, per se, but the most objective thing the ALJ seems to point to would be the non-examiners, but that was May 2015 when less than half of the E exhibits and roughly half, I think, to 9F of the F exhibits were in, so very little evidence was in at that point. And you mentioned the issue of the records, and you're right that some of what the vocational, and this pivots to the third issue that I didn't quite get to, so thank you. This, and I'm planning to reserve a little bit of time, this pivots to the third issue in terms of the lack of an empirical basis for those VE numbers, and yeah, it sounds okay, maybe, but the problem is that if you go, and this is a footnote, 300 something in my brief, I think, but if you go look up, and the idea is that all this stuff is objectively verifiable or empirical in some fashion, if you go look up the OES code for dishwasher, like 35-9021.00, there is 517,000-ish jobs in that OES category, and that includes both the skilled and unskilled, very heavy, and otherwise, so there's like dietary aid, dish machine operator. Ms. Bradman, how did the use of this Skiltrans software, though, factor into this? Because didn't the Skiltrans software, isn't the idea behind the software that it does give a more nuanced view of the appropriate jobs that are available? It could, and that's an issue for debate, Your Honor. However, this case does not even reach that question because the VE's testimony is logically and internally inconsistent by claiming, he says that he subtracts out the skilled jobs and the different exertional jobs, and then gets to this, I think it was 540,000-some dishwasher jobs, but when you look it up, and you look up the OES code or the SOC code that that stems from, which is in the briefing, that says 517,000 jobs. That's internally consistent. The numbers don't add up, the math isn't there, whether or not you reach the question of Skiltrans validity or not. Well, Mr. Rodman, it, but... And I'd like to reserve time, although I'll answer your question. Let me just ask you a quick question. I've got the transcript right in front of me, okay, and it was your colleague, wasn't it not, Mr. Forbes, that was doing the cross-examining of the VE. And when you look at the transcript, the VE, I think it's Judge Wood and maybe Judge Baird are going to, VE walks through how the numbers were derived and said, I just did a summation of the dishwashers in the applicable codes within that industry, and I got to 541,000. And there's no effort from there to impeach. So, how can we say under a substantial evidence standard, which is not that exacting, that the ALJ committed reversible error in relying upon that testimony to come up with an approximation of jobs numbers? I'll say in a sentence, then I'll reserve my time. I would say it has to do with the lack of rationality of that, and that lack of rationality was objected to after the number there on AR-669. And also, it has to do with the numbers just not adding up, and I'd like to reserve my time. Thank you. Mr. Montenegro. Yes, Your Honor. Good morning. My name is Leo Montenegro, appearing for the defendant appellee, the Commissioner of Social Security. I'd like to add on a little bit to the discussion of Mr. Bruno's work activities, because they are evidence of record, and the ALJ did focus on that. The relevant period of time here is roughly from August 2014 to August 2017. That's the period of time that was addressed by the ALJ in his decision. Claimant Mr. Bruno started working at a bakery in October 2016. That's in the record at page 565. Prior to that, he had worked as a restaurant busser. The ALJ doesn't mention this, but it was noted in the record at pages 591, 196 to 197. There's about a six-month span of time, I think, between those two jobs. Could I just interrupt you for a second, Mr. Montenegro? Sure. He clearly seems to have had a number of not very successful efforts at working when he didn't have his father and his cousin there to mediate things for him. I'm looking at the ALJ's formal residual functional capacity description, which is in boldface in paragraph 4, section 4, whatever. Residual functional capacity, medium work, accepts the claimant can understand, remember, and carry out simple routine tasks, use judgment-limited to simple work-related decisions, have brief and superficial interactions with supervisors and coworkers. What I don't see in that is the need for a supervisor to provide relatively constant supervision, to be able to intervene the way his father does or apparently sometimes the cousin does. And many employers don't want to hire somebody who needs to be babysat during the entire time they're at work. You know, this is a regular, in-the-economy job that the commissioners ask whether he can do. And just because he can do something that's so much more assisted doesn't necessarily allow the inference that he can work independently. And the ALJ doesn't say, you know, with close supervision or doesn't throw that in, so the VE isn't looking at that. Yes, Your Honor. The ALJ didn't make those findings because I believe the ALJ didn't think that they were necessary or appropriate in this case. While plaintiff's relatives, his father in particular, says that he spent time working with or advising or I guess effectively supervising his son at work, that, I would say, is more the father's choice to do so. And the records from the therapist and the nurse practitioner who both gave him mental health treatment both show that Mr. Bruno had problems with his family relationships. I believe his father was described, his father said that his son was spoiled. And it looks like that there are some problematic interactions with the family. But the actual medical opinion evidence didn't say that claimant needed constant supervision of the sort, nor did the treatment notes at the time. Doctors Loveco and Larson, the state agency psychologists who gave very specific opinions as to Mr. Bruno's functional limitations, said nothing about the need for constant supervision. The ALJ pretty much adopted the opinions of Drs. Loveco and Larson as to mental functional limitations. And during the relevant period, when claimant was being treated by nurse practitioner Lockren, I think it is, and therapist Mr. Weigel, they described him as being, well, they didn't say that he needed constant supervision. They did describe him as much like a normal 20-year-old going through difficulty at work and learning how to handle people. That's at page 571. His work at the restaurant, although not discussed by the ALJ, didn't mention any need for constant supervision, although there was little discussion of that. His work at the bakery, apart from his father's allegations and Mr. Bruno's own allegations, there didn't seem to be any mention of the need for constant supervision. The real problems that he had there, as documented in the therapist's notes and nurse practitioner Ms. Lockren's notes, was that it was a very strenuous job and it was very tiring for him. And that's one of the reasons I imagine that the ALJ did not find him capable of doing that job, was because it required lifting up to 100 pounds. I think those were bags of flour that he was supposed to put in the machine. He had multiple 12-hour shifts in which he was on his feet, as he described to his therapist. And he also described being, excuse me, very tired and worn out, and that he was having problems because of that. So if he was having problems with his job at the bakery, his part-time job at the bakery, it was because of the strain, not because of any mental problems that required him to have a lot of supervision or that impacted his ability to do unskilled work because of problems with concentration, persistence, or pace. I think on this point, Your Honor, the medical evidence, that is, the opinions of Drs. Lovko and Larson, including his treatment notes from nurse practitioner Ms. Lockren and his therapist, Mr. Weigel, they all line up, especially when you look at the work activity that he was actually doing. And looking at all of that together, there doesn't seem to be any support for ongoing mental limitations, especially regarding concentration, persistence, or pace and unskilled work or need for supervision that would prevent him from performing the work that the ALJ ultimately found based on the VE's testimony. So the ALJ does acknowledge, I'm looking at page 7 of the ALJ's opinion, that there were less than optimal findings as well, including poor attention concentration, appearing aloof, poor eye contact, irritability, and so on. There's a list of these things, Asperger's syndrome, impulse control. How does that get factored into the RFC? I'm sorry, I'm just finding that in the ALJ's decision. Yeah, it starts down at the bottom of page 7 of 11, the last five lines or so of that page. Thank you. I do see that. In this case, going before the relevant period, it's undisputed that when he was younger that he had serious problems related to, I don't know how they called it at the time, Asperger's syndrome or some form of autism, or I think they called it a phonologic disorder at some point. But over time, apparently he got better. So when he was five years old, this is at page 559, they described significant problems. And later in 2014, he was described as having Asperger's syndrome, impulse control problems, a bit more moody. But even then, he was working part-time. That's at page 517. That's Nurse Loughran's note. And as time progressed into the relevant period, as I said, he was working part-time throughout the relevant period. And his own therapist, Mr. Weigel, described him as, quote-unquote, normal, a normal 20-year-old having normal problems adjusting to work. So it wasn't as bad as it was in the past, although it did affect his ability to work. And that's reflected in the ALJ's findings. There were problems with concentration, persistence, or pace. Claimant was limited to unskilled work, but Mr. Bruno still could do the jobs that the vocational expert identified. Now, I should get to the daily activities. I think it's pretty clear the daily activities that the ALJ focused on in a couple paragraphs in his decision were the work activities he was doing. And those spoke very pointedly towards claimant's ability to work because, well, even though it was part-time work, he wasn't impeded by any kind of mental functional limitations. Again, it was more the physical problems. And as I'm nearing the end of my time, I should address the vocational expert testimony. I just want to point out there that the jobs identified by the vocational expert aren't arcane or obscure jobs. And it just so happens that the jobs identified by the vocational expert, well, they're dishwashing, cleaning, order pickers. These are jobs that exist. I don't think that there's any question. It seems common sense to me anyway that these jobs exist in some kind of numbers. And the vocational expert explained where he got his numbers from. He is an expert. His resume is in the record from pages 359 to 362. His methodology is there. His expertise is undisputed. And the jobs that he identified are consistent with the ALJ's findings as to functional limitations, and they're not that far off from the jobs a claimant would be doing on a part-time basis anyway. Although I'll point out again that the job at the bakery was an extremely strenuous job, and his complaints were all about the strain. Again, there were no mental functional limitations supported by the record to show otherwise. And the ALJ's findings were supported by substantial evidence in the form of both the medical evidence, at least, and also claimant's own activities, which the ALJ couldn't avoid because they were so obvious. If there are no further questions, Your Honor, I think I just ran out of time. I see none, so thank you. And, Mr. Rodman, I will give you a full minute for rebuttal. You were asking some questions. Thank you, Your Honor. I would say that the VE used words to explain a methodology of some kind, but the words on close examination were not rational and didn't hold together. No allocation factor was argued, and the math didn't add up objectively in terms of being objectively reviewable. In addition, morbid obesity wasn't mentioned in the decision, nor was the fact that he was limited to less than eight hours work in 17F. And these things underscore other arguments as well. And overall, I would just say that if this gentleman had no accommodations, no redirection to task, would he have been able to work at all? And I think the answer is unequivocally no. Thank you. All right. Thank you very much. Thanks to both counsel. We will take this case under advisement.